IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

KEITH THARPE,                          :
                                       :
               Petitioner,             :
                                       :
        vs.                            :
                                       :   CIVIL ACTION NO. 5:10-CV-433 (CAR)
CARL HUMPHREY, Warden,                 :
                                       :
               Respondent.             :
                                       :
_____:

## ORDER

**KEITH THARPE** petitions the Court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  For the reasons discussed below, Tharpe's petition is denied.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.    Facts

The Georgia Supreme Court summarized the facts of this case in Tharpe's direct
appeal:

> Tharpe's wife left him on August 28, 1990 and moved in with her mother.
> Following various threats of violence made by the defendant to and about
> his wife and her family, a peace warrant was taken out against him, and
> the defendant was ordered not to have any contact with his wife or her
> family.  Notwithstanding this order, Tharpe called his wife on September
> 24, 1990 and argued with her, saying if she wanted to "play dirty," he
> would show her "what dirty was."

On the morning of the 25th, his wife and her sister-in-law met Tharpe as they drove to work.  He used his vehicle to block theirs and force them to stop.  He got out of his vehicle, armed with a shotgun and apparently under the influence of drugs, and ordered them out of their vehicle.  After telling the sister-in-law he was going to "f--- you up," he took her to the rear of his vehicle, where he shot her.  He rolled her into a ditch, reloaded, and shot her again, killing her.[1]

Tharpe then drove away with his wife.  After unsuccessfully trying to rent a motel room, Tharpe parked by the side of the road and raped his wife.  Afterward, he drove to Macon, where his wife was to obtain money from her credit union.  Instead she called the police.

*Tharpe v. State*, 262 Ga. 110, 110-11, 416 S.E.2d 78, 79 (1992), *overruled in part by O'Kelley v. State*, 284 Ga. 758, 670 S.E.2d 388 (2008).

### B.   Procedural History

Tharpe was tried January 2 through January 10, 1991 in Jones County and was found guilty of malice murder and two counts of kidnapping with bodily injury.  *Id* at 110 n.1, 416 S.E.2d at 79 n.1.  The jury sentenced Tharpe to death for the murder.  He filed a motion for new trial that was denied on August 15, 1991.  *Id.*  The Georgia Supreme Court affirmed his conviction and sentence on March 17, 1992.  *Id.* at 110, 416 S.E.2d at 79.

Tharpe filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on March 17, 1993, first amended the petition on December 31, 1997

---

[1] Tharpe's wife could not remember if the sister-in-law had been shot twice or three times. However, the autopsy established that the victim had been shot three times—once in the arm, once in the chest and once in the head.

and amended it again on January 21, 1998.  (Docs. 13-2, 13-8, 13-11).[2]  The state habeas

court conducted evidentiary hearings on May 28, 1998, August 24, 1998, December 11,

1998, December 23, 1998, and July 30, 2007 and denied relief in an order dated

December 1, 2008.  (Docs. 14-1 to 14-7; 15-1 to 15-2; 15-13 to 15-17; 16-1 to 16-2; 17-1 to

18-11; 19-10).

On November 8, 2010, Tharpe filed in this Court a Petition for Writ of Habeas

Corpus by a Person in State Custody, which he later amended.  (Docs. 1, 25).

Respondent filed his answer and amended answer and the Court entered Orders

addressing procedural default and denying Tharpe's motions for discovery and an

evidentiary hearing.  (Docs. 9, 22, 25, 27-28, 37, 45, 49).  Both parties have now briefed

the issues.  (Docs. 57, 58, 62).

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides

the standard of review.[3]   Pursuant to 28 U.S.C. § 2254(d), this Court may not grant

habeas relief with respect to any claim that has been adjudicated on the merits in state

---

[2] Because all documents have been electronically filed, this Order cites to the record by using the document number and electronic screen page shown at the top of each page by the Court's CM/ECF software.

[3] Tharpe complains that the state habeas court "adopt[ed] nearly verbatim the Respondent's proposed order denying all relief."  (Doc. 57 at 14).  Both Supreme Court and Eleventh Circuit precedent provide that AEDPA deference is still required.  *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) (citing *United States v. Marine Bancorporation*, 418 U.S. 602, 615 n.13 (1974); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-57 (1964)); *Rhode v. Hall*, 582 F.3d 1273, 1281 (11th Cir. 2009); *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002).

court unless the state court's decision was (1) "contrary to ... clearly established Federal law;" or (2) "involved an unreasonable application of ... clearly established Federal law" or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *see also Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). The phrase "clearly established Federal law" used in § 2254(d)(1) refers to the holdings, not the dicta, of the United States Supreme Court cases in existence at the time of the relevant state court decision. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing *Williams*, 529 U.S. at 404-05).

> Under § 2254(d)(1), "[a] state court's decision is 'contrary to'... clearly established law if it 'applies a rule that contradicts the governing law set forth in [the United States Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a [different] result….'"

*Michael v. Crosby*, 430 F.3d 1310, 1319 (11th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably

extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)). An "unreasonable application" and an "incorrect application" are not the same:

> "We have explained that an unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."

*Hill v. Humphrey*, 662 F.3d 1335, 1344-45 (11th Cir. 2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).

Under 28 U.S.C. § 2254(d)(2), district courts can "grant habeas relief to a petitioner challenging a state court's factual findings only in those cases where the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Price v. Allen*, 679 F.3d 1315, 1320 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2)). A state court's determination of a factual issue is "presumed to be correct" and this presumption can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. THARPE'S CLAIMS[4]

### A.  Ineffective assistance of counsel in the investigation and presentation of mitigation evidence

1. <u>*Strickland v. Washington*, 466 U.S. 668 (1984).</u>

"*Strickland* is the touchstone for all ineffective assistance of counsel claims."[5]

*Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).  To obtain relief for ineffective

assistance of counsel, Tharpe "must meet both the deficient performance and prejudice

prongs of *Strickland*."  *Wong v. Belmontes*, 558 U.S. 15, 16 (2009).  To establish deficient

performance, Tharpe must show that "counsel's representation fell below an objective

standard of reasonableness."  *Strickland*, 466 U.S. at 688.  The Court must apply a

---

[4] Tharpe initially submitted a brief consisting of 158 pages, and later filed a reply brief consisting of 30 pages.  (Docs. 57, 62).  He states that he "does not abandon any claims not ... addressed [in his briefs], but relies instead on factual and legal arguments contained in the petition itself, his subsequent Reply to Respondent's Answer-Response, and in briefing before the state courts ...."  (Doc. 57 at 6).  This Court addresses in detail only those claims that Tharpe addressed in his two briefs.  "[M]ere recitation in a petition, unaccompanied by argument, in effect forces a judge to research and thus develop supporting arguments—hence litigate—on a petitioner's behalf.  Federal judges cannot litigate on behalf of the parties before them, and it is for this reason that any claims in [Tharpe's] petition that were not argued in his brief are abandoned."  *Blankenship v. Terry*, 2007 WL 4404972 at *40 (S.D. Ga.), aff'd 542 F.3d 1253 (11th Cir. 2008) (citing *United States v. Burkhalter*, 966 F. Supp. 1223, 1225 n.4 (S. D. Ga. 1997); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998)).  Alternatively, Tharpe certainly has not carried his burden of showing that the state courts' adjudications of these unaddressed claims were contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or that the decisions were based on unreasonable factual findings.

[5] Tharpe complains that the state habeas court failed to refer to any "United States Supreme Court case post-*Strickland* … in the analysis of [his] ineffective assistance of counsel claims."  (Doc. 57 at 73 n.63).  Post-*Strickland* cases are illustrative of the proper application of *Strickland*.  However, the merits of an ineffective assistance claim are still "squarely governed by [the Supreme Court's] holding in *Strickland*."  *Williams*, 529 U.S. at 390.  The state habeas court applied *Strickland* and was not required to cite or refer to post-*Strickland* cases.

"'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). "To overcome that presumption, [Tharpe] must show that counsel failed to act 'reasonabl[y] considering all of the circumstances.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, Tharpe must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When determining if prejudice exists, "it is necessary to consider all the relevant evidence that the jury would have had before it if [Tharpe's trial counsel] had pursued the different path–not just the mitigation evidence [trial counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it." *Wong*, 558 U.S. at 20; *see also Porter v. McCollum*, 558 U.S. 30, 40-41 (2009).

Federal courts must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)). Thus, Tharpe must do more than satisfy the *Strickland* standard. "He must also show in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (quoting *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Tharpe alleges that trial counsel's investigation into his background and limited intellectual abilities fell well below prevailing professional norms and their failure to conduct a reasonable investigation was the result of their inattention, as opposed to strategic judgment. The state habeas court decided this claim on the merits. Thus, the issues for this Court are whether the state habeas court's decision was contrary to, or involved an unreasonable application of, *Strickland*, or if it was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). To reach its decision, this Court reviews the record, the state habeas court's order, and the parties' briefs.

### 2. Trial counsel's experience

Tharpe was represented by two experienced criminal defense attorneys: Charles Newberry and Shane Geeter. Newberry was appointed lead counsel in either October or November 1990.[6] (Docs. 15-13 at 32, 52; 15-14 at 4, 12; 15-15 at 23). At the time of Tharpe's trial, Newberry had been practicing law in Jones County, Georgia for seventeen years. (Doc. 15-13 at 30). After graduating from law school, he worked as an Assistant District Attorney and, later, Chief Assistant District Attorney for the Ocmulgee Judicial Circuit. (Doc. 15-13 at 30-35). As a prosecutor, he handled fifty to

---

[6] Reginald Poss was originally appointed to represent Tharpe. (Doc. 15-14 at 37-38, 42). He and Newberry worked together on the case until Poss was removed on November 29, 1990 due to a conflict of interest. (Doc. 15-14 at 37-38, 42). Newberry met with Poss on several occasions, reviewed and copied his file, discussed strategy and psychologists with him, and basically "went over everything he had done," in Tharpe's case. (Doc. 15-14 at 37-38).

one-hundred jury trials and "countless numbers" of non-jury trials.  (Doc. 15-13 at 35).

The cases he tried included "murder, robbery, rape, kidnapping, battery, aggravated

battery, aggravated assault, theft, [and] forgery."  (Doc. 15-13 at 35).  He was appointed

probate judge in 1978, during which time he also worked in private practice handling a

variety of civil and criminal cases.  (Doc. 15-13 at 34-35).  After leaving the probate

court, he worked in private practice, where criminal defense work accounted for one-

fourth of his practice.  (Doc. 15-13 at 36-37).  By the time he was appointed to represent

Tharpe, he had represented defendants in approximately twenty-five criminal jury

trials involving "[e]verything from murder, death penalty cases, robbery, rape, [and]

child molestation."  (Doc. 15-13 at 38).  Newberry had already been lead counsel in

three death penalty cases, none of which resulted in the defendant receiving a death

sentence.  (Docs. 15-13 at 38-44; 15-14 at 33).

Geeter was appointed as co-counsel in November or early December 1990.  (Doc.

16-1 at 6, 58).  After graduating from law school, he worked in private practice for

approximately four years before becoming a Child Support Assistant District Attorney

and, later, an Assistant District Attorney in the Ocmulgee Judicial Circuit.  (Doc. 16-1 at

7-8).  As a prosecutor, his cases included aggravated assault, drug, theft, forgery, and

burglary cases and he had handled approximately seven to eight criminal jury trials.

(Doc. 16-1 at 7-9).  After leaving the District Attorney's office, Geeter went into private

practice and handled approximately twenty-five to thirty criminal trials prior to

appointment in Tharpe's case.  (Doc. 16-1 at 11).  Although he had been involved in two murder cases prior to appointment in Tharpe's case, he had not tried any murder cases. (Doc. 16-1 at 12).

### 3. <u>Trial counsel's investigation into both the crime and Tharpe's background</u>

Trial counsel met with Tharpe "repeatedly throughout the preparation, investigation and trial, [and] talked with him at great length about every detail of the case."  (Doc. 15-13 at 62).  Newberry estimated that he met with Tharpe approximately twenty to thirty times prior to trial.  (Doc. 15-15 at 18-19).  Geeter testified that he "spoke at length with Mr. Tharpe about his background [and] … asked him … about his life history."  (Doc. 16-1 at 22).  Trial counsel questioned Tharpe about his childhood. (Doc. 15-13 at 96).  Tharpe told Newberry "he had good parents, a good loving family, they loved each other, a good home, [and] a good upbringing."  (Doc. 15-13 at 96).  He stated that he came from "a good part of town," and was an average student who liked school.  (Doc. 15-13 at 96).  Tharpe told Geeter that he had "a wonderful childhood, loving parents, [and] a good family."  (Doc. 16-1 at 23).  He never mentioned drinking alcohol at an early age and never spoke of any type of childhood abuse or hardships. (Doc. 16-1 at 91).

Tharpe confirmed various aspects of the State's case.  (Doc. 15-13 at 69).  The only difference between his version of events and the State's version was that Tharpe

maintained he struggled with the victim before the first shot.  (Doc. 15-13 at 69-70).

Tharpe admitted shooting Freeman once, reloading the gun, and shooting her again.

(Doc. 15-13 at 70).

Trial counsel spoke with the District Attorney, discussed the District Attorney's

strategy, repeatedly attempted to negotiate a plea bargain, and copied all of the

evidence in the Georgia Bureau of Investigation's and District Attorney's files.  (Docs.

15-13 at 54-55, 70-71; 16-1 at 13).  Trial counsel interviewed all of the witnesses shown

on the State's list of witnesses, including local and state investigators, the ballistics

expert, and the pathologist.  (Docs. 15-13 at 54-56; 15-15 at 27-28; 16-1 at 14-15).  Trial

counsel knew that the District Attorney planned to use Tharpe's prior habitual violator

conviction and viewed copies of the conviction and sentence in the District Attorney's

files.  (Doc. 15-15 at 12).  Geeter explained that they also went to the Bibb County

Superior Court to review the file of the habitual violator case against Tharpe.  (Doc. 16-1

at 14).

Trial counsel visited the murder scene twice and reviewed the autopsy report on

the victim.  (Docs. 15-13 at 55; 16-1 at 13).  They also spoke with other attorneys about

the case and reviewed death penalty litigation manuals and books.  (Doc. 15-13 at 70).

Tharpe provided trial counsel with the names of friends and family members and trial counsel spoke with these individuals in person on several occasions.[7]   (Docs. 15-13 at 94-95, 98-99; 15-15 at 73, 76; 16-1 at 23).  They asked family members about Tharpe's childhood.  (Docs. 15-13 at 98; 16-1 at 23-24).  Newberry explained that "[f]rom his mother to his sisters to his aunt, a family friend, it was all positive."  (Docs. 15-13 at 99; 15-15 at 89, 155).  No family member mentioned that Tharpe's mother was abusive or ran a "shot house."  (Docs. 15-13 at 89; 16-1 at 25).  No family member or friend interviewed ever mentioned that Tharpe suffered any type of physical or mental abuse. (Doc. 16-1 at 91).  Tharpe's family lived in a nice home on a "middle class and upper middle class road."  (Docs. 15-13 at 101-02; 16-1 at 26).  Family members reported that Tharpe "did well in school."  (Doc. 15-15 at 153).

Newberry explained that Tharpe gave him the names of former supervisors or employers and they interviewed these individuals.  (Doc. 15-13 at 97).  However, these people did not have anything good to say about Tharpe.  (Doc. 15-13 at 97).  Newberry explained that Tharpe had a poor work record because he routinely got mad and lost his temper with his superiors "and either would quit or they would fire him."  (Doc. 15-13 at 97).  Based on conversations with Tharpe and his previous supervisors or

---

[7] Trial counsel filed a motion for funds to hire an investigator on November 29, 1990.  (Doc. 15-14 at 48).  They hired Jay Clark, whose main purpose was to serve subpoenas.  (Docs. 15-14 at 51; 15-15 at 9).  Clark did not conduct a mitigation investigation because trial counsel did that investigation themselves.  (Doc. 15-15 at 13).

coworkers, trial counsel determined they did not want to use his employment history as part of their mitigation case.  (Doc. 15-15 at 14).

Trial counsel did not obtain Tharpe's school records.  (Docs. 15-15 at 14; 16-1 at 64-65).  Newberry could not recall if he had spoken with any of Tharpe's teachers and Geeter recalled that he did not speak with Tharpe's former teachers.  (Docs. 15-15 at 83; 16-1 at 95).  Trial counsel did not obtain Tharpe's medical records.  (Doc. 15-15 at 14). They did ask Tharpe if he had suffered any head injuries as a result of falls, fights, accidents, or sports related injuries.  (Doc. 16-1 at 22).  He reported that he had not. (Doc. 16-1 at 23).  Trial counsel did not obtain arrest records for Tharpe's immediate family members because Tharpe reported a happy childhood with a loving family. Thus, according to trial counsel, there was no reason "to look further on that."  (Doc. 15-15 at 16).  Tharpe did tell trial counsel he did not pass the test to get into the military or did not meet the military's requirements.  (Doc. 16-1 at 94).

### 4. Trial counsel's investigation into mental health evidence

Newberry stated that he spoke with Tharpe "over and over again, … every few days" and he "never had any doubt whatsoever about [Tharpe's] ability … to assist [his defense]."  (Doc. 15-13 at 112).  Geeter testified that Tharpe seemed to be "an average person" who was able to communicate with counsel and understand what has happening.  (Doc. 16-1 at 25-26).  He explained that Tharpe had a good understanding

of the trial process, showed no signs of mental retardation, had graduated from high

school, had participated in school sports, and had held various jobs.  (Doc. 16-1 at 37).

When asked on what he based his opinion that Tharpe was not mentally retarded,

Newberry explained:

> Based on talking with him hours.  And I made that decision right off the
> bat.  The first time I talked with him was at length, but it was further
> supported by every time I met with him.  The, I have, in addition to
> criminal cases, I've dealt with many, many, people who were borderline
> or low intelligence or borderline retarded, borderline mentally defective
> from Alzheimer's or various other problems.  I've had to make decisions
> countless times to decide whether people were capable of signing various
> documents, powers of attorney, wills and certain things.  I feel like I know
> how to decide if a person knows what he is doing and is intelligent or not,
> and I had no doubt about … [Tharpe].

(Doc. 15-13 at 114-15).

Trial counsel testified that Tharpe participated in and assisted with his defense.

(Docs. 15-13 at 125-26; 15-15 at 99-100).  Moreover, no family member or friend ever

expressed a concern that Tharpe was mentally retarded or had any problems with his

mental faculties whatsoever.  (Doc. 15-13 at 128).

The trial court ordered a pretrial psychological evaluation that was performed by

Dr. Robert Storms.  (Doc. 10-1 at 21-22).  Trial counsel questioned Storms, who indicated

that Tharpe had no psychological problems and had "low average" intelligence.  (Doc.

15-13 at 112, 122).  Trial counsel read Storms' report, which revealed Tharpe had:

"average intelligence"; "no signs of mental retardation"; "no history of extensive blows to the head"; "no history of psychiatric hospitalizations or outpatient psychiatric treatment"; no "history of thought or mood disorder"; a "substantial history of alcohol abuse"; "a history of drug abuse"; and "no disorder of mood or thought." (Docs. 16-1 at 125; 15-17 at 19). Storms' report also showed that Tharpe tried to appear to be mentally ill:

> An MMPI was also administered. The results are not considered valid. Mr. Tharpe was, in my opinion, malingering. That is to say he attempted to answer questions in such a way that he would appear to be mentally ill. However, if he was as depressed and confused as the results that this particular MMPI indicates, he would not be able to function. He would be in a severe vegetative state and would be incoherent. Mr. Tharpe appeared to be functioning at a highly satisfactory level and he was fairly articulate in his communications.

(Doc. 15-17 at 19-20).

Geeter explained that he knew Storms both personally and professionally and Storms, who was "very candid," said "there is nothing wrong with [Tharpe]." (Doc. 16-1 at 39). According to Geeter, Storms said Tharpe did not suffer from diminished capacity or insanity. Instead, he was "just mean as hell." (Doc. 16-1 at 39). Similarly, Newberry stated that Storms told him Tharpe was "mean as a snake." (Doc. 15-13 at 123).

Although Newberry "never doubted from the start [Tharpe's] ability whatsoever," it was his practice to hire a psychologist as a matter of course in death

penalty cases.  (Doc. 15-13 at 113).  Trial counsel obtained funds to hire Dr. Archer

Moore, a psychologist who had assisted Newberry in a previous death penalty case.

(Doc. 15-13 at 93-94, 111).  Newberry testified that he wanted Moore to evaluate Tharpe

for competency, sanity, and "anything else he could find that might be of help to [the

defense]."  (Doc. 15-15 at 159).  Moore reported that Thape had no psychological

problems; would be able to assist counsel during trial; was competent to stand trial; and

knew right from wrong.  (Doc. 15-13 at 123).  Moore's report showed Tharpe had a full

scale IQ of 74[8] and that Moore was suspicious Tharpe was able to graduate from high

school "due to social promotion."  (Doc. 15-17 at 24).  He explained:

> Psychometric data would suggest that he is not psychotic but that he does
> have at least moderately limited intellectual abilities probably due to long
> term Ethanol abuse and he is rather impulsive.  He does not seem to be
> someone who would set up a complex or long range plan for anything but
> simply reacts rather impulsively to circumstances.  There seems to be the
> tragic combination of limited intelligence, long term Ethanol and poly-
> substance abuse coupled with marital strife and what he perceives as an
> in-law interference.

(Doc. 15-17 at 25-26).

Moore's letter to trial counsel explained that Tharpe "is a long time alcohol and drug

abuser" who has a "functional intelligence which falls in the borderline range but, here

again, should not be considered mentally retarded."  (Doc. 15-17 at 27).  Newberry

---

[8] Later, Moore explained that he had miscalculated and the score was actually 73.  (Doc. 17-9 at 40).

stated that Moore told him not to call him as a witness because he thought Tharpe was a "mean son-of-a-bitch."  (Doc. 15-13 at 124).

### 5. Trial counsel's strategy

Newberry explained that he knew soon after appointment "there was going to be a conviction of some kind."  (Doc. 15-15 at 34).  Trial counsel's strategy for the guilt-innocence phase was to show that the murder happened as a result of a domestic dispute and that Tharpe's actions were driven by passion or emotion, not malice. (Docs. 15-13 at 72; 16-1 at 27).  Geeter explained that they wanted the jury to see Tharpe not as "a person with a malignant heart" but someone "who loved his family and committed a horrible act not because of meanness but because he was just wracked with emotion."  (Doc. 16-1 at 27).  While they did not think they would get a voluntary manslaughter verdict in the case, they argued for it in the guilt-innocence phase to lay the foundation for the sentencing phase.  (Docs. 15-13 at 72; 16-1 at 28, 68).

Newberry explained the sentencing phase strategy:

[O]ur primary strategy was to take what we had discussed and the evidence we had presented and the argument in the guilt-innocence phase on the domesticity of the case, the emotion, the passion, the doubt that we tried to show in the State's case, the inconsistencies and so forth, and then say, this case, this murder case can be distinguished from a death penalty murder case because this case has problems, it has reasons why the jury should say, this is not a death penalty case.

> The other strategy in the … sentencing case was to show that [Tharpe] has
> some value and worth as a person, that he is a person, even if he has fallen
> considerably short of certain attributes he should have, he is a person who
> is worthy of his life being spared, and we did that through presenting
> family and friends showing that he is a person of reasonable intelligence, a
> decent family guy.

(Doc. 15-13 at 73).

Their strategy for the sentencing phase included having Tharpe testify.

Newberry stated that Tharpe wanted to testify and trial counsel explained their decision

to allow such testimony:

> To let the jury see that he could talk, that he was capable of
> communication, that he was a living, breathing person with feelings.  And
> I wanted them to have some eye contact with him and hear him talking
> and establish a rapport with him.  I wanted him to, at least to some extent,
> maybe ask for mercy on himself.  But I wanted them to have enough
> contact with him, other than just seeing him sitting quiet at the defense
> table in hopes that that would have an effect on them.

(Doc. 15-13 at 105).

Trial counsel explained they knew Tharpe drank alcohol, engaged in drug use,

and had a DUI conviction and habitual violator conviction in his past.  (Docs. 15-13 at

106; 16-1 at 30).  While they knew the State wanted to present evidence of Tharpe's

alcohol abuse, trial counsel did not want to present testimony regarding alcohol or drug

use.  (Docs. 15-13 at 106; 15-15 at 81).  Newberry explained that the jury would not

"excuse anything [Tharpe] did based on him drinking while he was doing it."  (Doc. 15-

- 18 -

13 at 106-07).  Instead, local jurors had a "dim view of alcohol" and drugs and such

information might be seen as aggravating, not mitigating.  (Doc. 15-13 at 107, 110).

Geeter testified that he did not want to present any history of alcohol abuse because he

"did not want to get into a battle with the [State] to see who could portray … Tharpe in

the most negative light."  (Doc. 16-1 at 30).  In short, trial counsel thought that

emphasizing alcohol and/or drug abuse would "have hurt [their] case more than it

helped."  (Doc. 15-13 at 107)

     While Newberry considered calling Moore as a witness, he ultimately decided

against it.  (Doc. 15-13 at 128).  Geeter explained that although they thought about

presenting evidence of intellectual functioning at trial, they ultimately rejected that

strategy:

> First of all, we put up Dr. Moore who was going to basically say that he
> was not retarded and not insane.  And [the State] was going to put up Dr.
> Storms who says in my professional opinion, he is mean as hell.  And then
> the jury is going to look at us like, what kind of wool are you … trying to
> [c]over our eyes [with] gentleman?  If this is the best you can do, you must
> have really have a bad case.

(Doc. 16-1 at 42).

     Newberry and Geeter both thought that mental retardation was not viable

defense at trial because if they "tried to stretch what [they] had into retardation," they

may have "lost credibility with the jury."  (Doc. 15-15 at 160; 16-1 at 125-28).  While trial

counsel acknowledged that they could have presented a defense that Tharpe was a person of low intelligence, they simply did not think that defense would be successful. (Doc. 15-13 at 129).  Instead, they decided to stick with their defense that Tharpe was a normal, decent family man who got caught up in an emotional situation.  (Doc. 15-13 at 129).

### 6. Decision to go to trial in January 1991

Trial counsel explained that they were ready to go to trial in January 1991 because they "had concentrated [their] time on this case, above all else," working "night and day" on it in November and December 1990.  (Docs. 15-13 at 81-82; 16-1 at 35). According to Newberry, it was easy to find witnesses because Tharpe and his family gave trial counsel plenty of names of persons to interview, but "the hard part was getting them to testify." (Doc. 15-13 at 99).  While his mother and aunt completely supported him, his sisters, children, and estranged wife, Migrisus Tharpe, were "extremely reluctant" to testify and "limited in what they would say." (Doc. 15-13 at 100-01).  According to Newberry, several of their witnesses "were going back and forth on whether they would testify." (Doc. 15-13 at 82).  Trial counsel worried that as more time passed, family members may become less sympathetic to Tharpe and they might lose potential witnesses.

Newberry met with Migrisus on several occasions.  (Doc. 15-13 at 56).  She was the State's key witness because she had witnessed the murder and was the victim of the kidnaping and rape.  (Doc. 15-13 at 60-61).  Newberry wanted her to testify on Tharpe's behalf during the sentencing phase of the trial.  (Doc. 15-13 at 57).  He explained that she was "walking a kind of a tight rope between what her family wanted her to do, which was against our interest[,] and what we wanted her to do for [Tharpe's] sake." (Doc. 15-13 at 57).  Although Migrisus' family, with whom she was living, did not want her to testify for Tharpe, trial counsel had her at a point where she was willing to testify on his behalf.  (Docs. 15-13 at 83; 16-1 at 35-36, 110).  Trial counsel felt her testimony was crucial and they feared if they delayed the trial, her family would have time to convince her not to testify for Tharpe.  (Doc. 15-13 at 83).

7. <u>Presentation during the sentencing phase of Tharpe's trial[9]</u>

The State introduced a certified copy of Tharpe's violation of the Georgia Habitual Violator Law, which occurred on February 3, 1988 and for which he pled guilty on May 4, 1988.  (Doc. 12-2 at 123).  The trial judge explained that the substance of that charge was for traffic violations only.  (Doc. 12-2 at 123-24).

---

[9] In keeping with their strategy, trial counsel's opening statement during the guilt phase of the trial stressed that this was a case about a domestic squabble, not a premeditated kidnaping, robbery, or murder.  (Doc. 11-12 at 43-44).  They emphasized that Tharpe was emotionally distraught when his wife left him and these crimes occurred as a result of those emotions.  (Doc. 11-12 at 44-45).

Trial counsel presented thirteen witnesses.  Tharpe's mother, Naomi Tharpe, testified that Tharpe had always been a good son, who loved her and loved his wife and children.  (Doc. 12-3 at 9-10).  She stated that Tharpe had many friends, was smart, "[m]ade good grades" in school, participated in the high school track team, and graduated from high school.  (Doc. 12-3 at 13-14).  She explained that it would hurt her as well as Tharpe's children if the jury imposed the death penalty.  (Doc. 12-3 at 12).

Tharpe's sister, Audrey Pope, testified that Tharpe was a smart, friendly person who went out his way to help others.  (Doc. 12-3 at 20-21).  She explained that Tharpe was emotional after his wife left him and he desperately wanted his wife and children back.  (Doc. 12-3 at 19).  She stated that Tharpe was remorseful and asked that his life be spared.  (Doc. 12-3 at 20).

Tharpe's cousin, Laverne Shermer, testified that he was a kind, sweet, helpful person who loved his wife and children.  (Doc. 12-3 at 24).  She explained that Tharpe often performed odd jobs, such as painting and cutting grass, to help her.  (Doc. 12-3 at 24).  She asked that he be given a life sentence.  (Doc. 12-3 at 25).

Migrisus testified that she still cared for Tharpe.  She and two of their daughters asked the jury to spare Tharpe's life.  (Doc. 12-3 at 62, 75, 77).

Tharpe's friends testified that he was raised in a Christian home, had a good heart, was always polite and helpful, loved his wife and children, missed his wife

terribly when she left him, and acted out of passion when he shot Freeman.  They testified that Tharpe regretted his actions and asked the jury to spare his life.  (Doc. 12-3 at 34-45, 39, 4-45, 49, 51, 55-57).

Tharpe testified that he loved his wife and children, he did not intend to kill Freeman, and he was sorry for what he had done.  (Doc. 12-3 at 96-97, 101, 111).

Having already found Tharpe guilty of malice murder and two counts of kidnapping with bodily injury, the jury sentenced Tharpe to death for the murder. (Doc. 10-2 at 108-09).

8. <u>Evidence presented to the state habeas court</u>

State habeas counsel tendered several affidavits from Tharpe's friends and family.  These affiants testified:  Tharpe was "slow"; he struggled in school; other children "were cruel to [Tharpe] because of his slowness"; Tharpe's parents ran a "shot house" at which they sold moonshine; Tharpe started drinking moonshine at a very early age; Tharpe was physically and verbally abused by his violent mother and father; he suffered numerous head injuries; and Tharpe's parents were so poor they did not have enough money to buy food for their children.  (Docs. 17-4 at 22-30; 57 at 28-30, 32-33).

Some affiants contradicted what they said during the sentencing phase of Tharpe's trial.  For example, during his trial, Tharpe's sister testified that Tharpe was relatively smart.  (Doc. 12-3 at 21).  However, in an affidavit submitted to the state habeas court, she described him as "slow" and stated he was "teased about being dumb."  (Doc. 17-4 at 33-34).  At trial, Patty Baxter, Tharpe's friend who raised and sold dogs, testified that Tharpe "knew a lot about dogs" and if her dogs had a health problem, she "would call him and talk to him and he pretty much knew" the answer.  (Doc. 12-3 at 55).  However, in her affidavit submitted to the state habeas court, she described Tharpe as childlike and explained that he could not be trusted to perform the simplest of tasks, "like feeding the dogs," without her constant instruction, guidance, and oversight.  (Doc. 17-4 at 18-21).

On May 28, 1998, state habeas counsel tendered into evidence an affidavit signed by Migrisus in which she provided details about Tharpe's various inabilities or shortcomings.  (Docs. 14-3 at 2; 17-4 at 39-42).  However, at the July 30, 2007 evidentiary hearing, Migrisus disavowed much of the affidavit's contents.  She explained that she never said "[b]ecause she was so young and inexperienced when [Tharpe] and [she] met, it took [her] years to realize how limited [Tharpe's] abilities were."  (Docs. 17-2 at 3; 17-4 at 40).  She testified that she knew she "didn't say that because [she] didn't realize if he does have any limited abilities."  (Doc. 17-2 at 3).  She stated that she never said Tharpe was incapable of helping his daughters with their homework.  Instead, he

simply did not help them because he was just "gone or busy with friends." (Doc. 17-2 at 4). Contrary to what was shown in her affidavit, she testified that when she worked, Tharpe was perfectly capable of cooking meals, cleaning the house, and taking care of their children without any assistance or oversight from her. (Doc. 17-2 at 4, 17). Also at odds with what was shown in the affidavit, she explained that she never said Tharpe did not understand basic nutrition and was incapable of buying groceries for his family. (Doc. 17-2 at 7-8). Although the affidavit made much of Tharpe's inability to pay bills or budget, Migrisus explained that she never thought any mental incapacity prevented Tharpe from taking care of the family's business. Instead, she just thought he was careless with his money and, therefore, she did not trust him with her money. (Doc. 17-2 9, 17). She explained that there was no family "budget" for Tharpe to understand because they lived paycheck to paycheck. (Doc. 17-2 at 9). Contrary to the affidavit, Migrisus testified that she did not think yard work and cleaning were the only jobs Tharpe could get. (Doc. 17-2 at 11). Instead, he previously held jobs in construction, at a textile mill, and at a trucking company. (Doc. 17-2 at 11, 13). Migrisus stated that she never said "[s]ometimes he would quit because other workers would crack jokes about him when he couldn't keep pace on the job." (Docs. 17-2 at 12; 17-4 at 41).

Migrisus explained that Tharpe drove a car, could follow driving directions, had friends, and occasionally sold drugs, which he measured on a scale he owned. (Doc. 17-2 at 18, 21, 22). She testified that he would act like a child when he was high on drugs,

- 25 -

which was the way he was acting the morning he killed Freeman.  (Doc. 17-2 at 20).

Migrisus stated that she was "surprised" to hear Tharpe had been diagnosed as

mentally retarded because there "was nothing that indicated that to [her]."[10]  (Doc. 17-2

at 23)

State habeas counsel also presented evidence, discussed in more detail below,[11]

that Tharpe suffered from organic brain dysfunction, significant intellectual deficits,

and mental retardation.

### 9. The state habeas court's order and Tharpe's arguments

Applying *Strickland*, the state habeas court, in a lengthy and detailed order, held

that Tharpe failed to show trial counsel's investigation and presentation of mitigation

evidence constituted deficient performance or that Tharpe was prejudiced.  (Doc. 19-10

at 9-68).  After a thorough review of the record (the relevant portions of which are cited

above), the parties' briefs, and the relevant case law, this Court finds that decision was

---

[10] During the guilt phase of Tharpe's trial, Migrisus testified about his intelligence or abilities. She answered yes to the following question:  "If you tried to outwit him or outsmart him about anything, generally, he could figure you out and you couldn't outsmart him.  Right?"  (Doc. 11-12 at 141).  She testified that Tharpe bought groceries, paid the water bill, and fixed their car when necessary.  (Doc. 11-12 at 157).  Her testimony also showed that Tharpe was capable of providing directions.  She explained that following the shooting, she and Tharpe went to a gas station in Macon, where two men asked them for directions and Tharpe was able to help them. (Doc. 11-12 at 152-53).

[11] Tharpe presented experts who testified that he is mentally retarded.  He also presented an expert who testified that he suffers from neuropsychological impairment and brain damage that occurred very early in his life.  The mental health experts' testimony is discussed on pages 43 to 54 of this Order.

not contrary to, or constitute an objectively unreasonable application of, *Strickland*, nor was it based on any unreasonable determinations of fact.  The Court, however, briefly considers Tharpe's arguments.

Tharpe takes issue with the state habeas court's assertion that trial counsel's extensive experience supports a greater presumption in favor of finding effective assistance of counsel.  (Doc. 57 at 55 n.43).  Contrary to Tharpe's argument, there is no indication the state habeas court "blindly accorded a layer of deference beyond that articulated in *Strickland*."  (Doc. 57 at 55 n.43).  Experience was just one factor the state habeas court considered when determining whether trial counsel's particular strategic choices were reasonable.  To do so was reasonable.  *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989); *Strickland*, 466 U.S. at 681.  The Eleventh Circuit has consistently held that the presumption in favor of effective assistance is even greater when trial counsel is experienced.  *See Fuguate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001); *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000); *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994).

Tharpe complains that, contrary to the state habeas court's finding, trial counsel rushed to trial and conducted a last-minute "shoddy investigation," into mitigation and mental health evidence.  (Doc. 57 at 50).  Although it is true Moore did not examine Tharpe until January 2, 1991, which was after jury selection had begun, trial counsel

started their mitigation investigation before that date.  (Docs. 11-1; 15-17 at 27).  Trial

counsel had already met with Tharpe on many occasions and had spoken with various

family members, friends, and previous employers.[12]   (Docs. 15-13 at 95-104; 15-15 at 18-

19, 72-73; 16-1 at 22-24).  Prior to trial, they had already received Storms' evaluation,

which revealed Tharpe was of "average intelligence," "exhibited no signs of mental

retardation," had no history of thought or mood disorder, but suffered from alcohol

and drug abuse, and was "malingering" or "attempt[ing] to answer questions in such a

way that he would appear to be mentally ill."[13]   (Doc. 15-17 at 28-20).  Furthermore,

trial counsel fully explained why they needed to start the trial as soon as possible—they

had Migrisus' support and willingness to testify for them during the sentencing phase

of the trial, but they feared her cooperation would fade over time.  (Doc. 15-13 at 82,

100-01).  The state habeas court found trial counsel's performance in this regard was

---

[12] Tharpe claims that "[t]rial counsel's first substantive meeting with potential mitigation witnesses occurred on January 6, 1991, after trial had already begun, and only four days before the commencement of the penalty phase of Mr. Tharpe's trial."  (Doc. 57 at 20).  The support provided for this assertion is Geeter's testimony in which he stated he does not "remember meeting with them any other time."  (Doc. 16-1 at 62).  Newberry, however, stated that he spoke with Tharpe's sister and aunt "various times"; "[m]et with others at other times"; and that some witnesses came to his office on at least one occasion.  (Doc. 15-13 at 94-95).  This was in addition to meeting with the witnesses "a day or two right before they testified" and again on "the day they testified."  (Doc. 15-13 at 95).  Tharpe acknowledges that trial counsel spoke with Migrisus prior to January 6, 1991.  (Doc. 57 at 20 n24).

[13] Storms' results are shown in a letter dated October 23, 1990 and copies of the letter were provided to both the District Attorney and Poss.  (Doc. 15-17 at 20).  After his appointment in October or November 1990, Newberry met with Poss, copied his entire file, and discussed psychologists with him.  Thus, it appears Newberry was aware of Storms' evaluation no later than November 1990. (Doc. 15-14 at 37-38).

reasonable and that finding was not based on any unreasonable factual determinations, nor did it involve an unreasonable application of *Strickland*.  (Doc. 19-10 at 30).

Comparing his case to *Wiggins v. Smith*, 539 U.S. 510 (2003), Tharpe maintains that trial counsel ignored "red flags" contained in the information they received.[14] (Doc. 57 at 50-51).  Tharpe's case is distinguishable from *Wiggins* in several respects. Wiggins' trial counsel had received a presentence investigation report ("PSI") and records from the Department of Social Services ("DSS").  *Id.* at 523.  The PSI showed that Wiggins spent most of his childhood in foster care, noted his "misery as a youth," and quoted him as saying his background was "disgusting."  *Id.*  The DSS records revealed more:  Wiggins' mother was a chronic alcoholic; he was moved from one foster home to another; he had emotional difficulties; he had frequent, lengthy absences from school; and his mother left him and his siblings at home alone for days without food. *Id.* at 525.  After receipt of these records, trial counsel did no further investigation into Wiggins' background and, despite telling the jury it would hear of Wiggins' "difficult life," they introduced no evidence of his life history during trial.  *Id.* at 526.  The Supreme Court held that trial counsel's limited investigation was unreasonable in light

---

[14] Along with *Wiggins*, Tharpe cites *Rompilla v. Beard*, 545 U.S. 374 (2005), for the proposition that counsel performs deficiently when he fails to "conduct further inquiry using available records containing 'red flags.'"  (Doc. 57 at 75).  The Supreme Court held that Rompilla's trial counsel performed deficiently when they failed to make reasonable efforts to review a readily available prior conviction file when they knew the prosecutor was going to emphasize the prior conviction.  *Id.* at 385-86.  Tharpe's trial counsel did not fail to review any such readily available file.

of what the PSI and DSS records actually revealed.  *Id.* at 525, 527.  Any reasonable attorney would have realized that pursuing the leads contained in these records was necessary in order to make an informed choice among possible sentencing strategies. *Id.* at 525.  Because Wiggins' trial counsel abandoned their investigation at an "unreasonable juncture" they necessarily failed to make a fully informed decision regarding their sentencing stragey.  *Id.* at 527.

This was not the situation in Tharpe's case.  Trial counsel spoke with Tharpe, his family members, and his friends.  Every one of them reported Tharpe had a good childhood, grew up in a Christian home, had a loving mother and father, lived in a good part of town, liked school, and was a decent student.  (Doc. 15-13 at 95-104). Tharpe himself denied any type of deprived background and explained he came from "a good family and [had] a good upbringing."  (Doc. 16-1 at 23).  In short, no one provided a "hint of anything negative."  (Doc. 15-13 at 101)

Neither Tharpe, nor his friends or family, revealed any "red flags" on which trial counsel should have followed-up.  Thus, trial counsel didn't abandon their investigation into Tharpe's background at an "unreasonable juncture" or ignore evidence showing a "traumatic and neglected childhood," "abusive parents," or "childhood exposure to alcohol."  (Doc. 57 at 23).  In *Strickland*, the Court explained that

the issue of what investigative decisions are reasonable depends, in large part, on

information obtained from the accused himself:

> The reasonableness of counsel's actions may be determined or
> substantially influenced by the defendant's own statements or actions.
> Counsel's actions are usually based, quite properly, on informed strategic
> choices made by the defendant and on information supplied by the
> defendant.  In particular, what investigation decisions are reasonable
> depends critically on such information.

*Strickland*, 466 U.S. at 691.

The Eleventh Circuit has consistently denied ineffective assistance of counsel claims for

counsel's failure to uncover childhood abuse or neglect when the defendant has

informed counsel that he was not abused or neglected.  *Stewart v. Sec'y Dep't of Corr.*,

476 F.3d 1193, 1210-11 (11th Cir. 2007) (denying claim that trial counsel was ineffective

for failure to uncover childhood abuse and mistreatment because defendant never

mentioned the abuse but, instead, "indicated just the opposite of poor treatment");

*Henyard v. McDonough*, 459 F.3d 1217, 1245 (11th Cir. 2006) (deciding that trial counsel's

failure to investigate and present evidence of defendant's childhood sexual abuse was

not deficient performance because defendant denied being sexually abused); *Van Poyck

v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324-25 (11th Cir. 2002) (denying claim that trial

counsel was ineffective for failing to investigate defendant's childhood and prison

abuse because defendant told counsel he did not consider himself an abused child and

he denied being raped in prison); *Lambrix v. Singletary*, 72 F.3d 1500, 1505-06 (11th Cir.

1996) (trial counsel not ineffective for failing to discover evidence of abuse when

defendant gave counsel no reason to believe that such abuse occurred).

Tharpe claims trial counsel would have learned he was "raised in a 'shot house'

among alcoholics by his violently abusive mother" had they just asked "pertinent

questions." (Doc. 57 at 7, 10). To substantiate allegations of this severely dysfunctional

childhood, Tharpe tendered to the state habeas court affidavits from several friends and

family members. As explained above, several of those affiants directly contradicted the

testimony they provided at sentencing. The Eleventh Circuit has explained:

> It is common practice for petitioners attacking their death sentences to
> submit affidavits from witnesses who say they could have supplied
> additional mitigating evidence had they been called, or, if they were
> called, had they been asked the right questions. This case is no exception.
> But the existence of such affidavits, artfully drafted though they may be,
> usually proves little of significance. This case is no exception in that
> respect, either.

*Waters v. Thomas*, 46 F.3d 1506, 1513-14 (1995).

Tharpe argues trial counsel failed to follow up on the "red flags" contained

within Moore's report, such as: Moore's finding that Tharpe's full scale IQ score was

74, which was "within the borderline range of intelligence"; Moore's opinion that

Tharpe was able to graduate high school only due to "social promotion"; and Moore's

statements regarding Tharpe's "limited intellectual abilities." (Doc. 15-17 at 21-28).

According to Tharpe, this would have prompted reasonable trial counsel to undertake

additional investigations into his mental functions and, at least, obtain his school records to verify the social promotions.  Looking at all of the information trial counsel had at the time, the Court cannot find trial counsel's performance deficient for failing to do more after receiving Moore's report.  Certainly, the Court cannot find the state habeas court's determination in this regard was unreasonable.  In addition to having Moore's report, trial counsel had spoken with Tharpe, his friends, and his family.  All of whom reported he was an average student, liked school, was "smart," or did well in school.  (Docs. 12-3 at 13-14, 20-21; 15-13 at 95-104, 128).  They also had Storms' outpatient evaluation, which showed that Tharpe was of "average intelligence."  (Doc. 15-17 at 19).  Furthermore, Storms had informed them that there was nothing wrong with Tharpe; he was just mean.  (Docs. 15-13 at 123; 16-1 at 39).

Contrary to Tharpe's assertions, the record does not show that trial counsel refused to consider any evidence that conflicted with their assessment of Tharpe's intellectual functioning or their defense strategy.  (Doc. 47 at 12, 17, 19).  Instead, they performed a cost benefit analysis on all of the pretrial evidence they received, including Moore's and Storms' evaluations, and decided to stick with their original strategy of showing Tharpe was "a normal guy that has got great value to him" and who was acting on emotion the day he shot Freeman.  (Doc. 15-13 at 128-29).  Trial counsel considered whether the jury would be sympathetic to a "low average intelligence"

argument during sentencing and determined that they "wouldn't get anywhere with that defense." (Doc. 15-13 at 129).

Tharpe also compares his case to *Williams v. Taylor*, 529 U.S. 362 (2000). (Doc. 62 at 17). Williams' trial counsel performed deficiently when they failed to uncover "extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Williams*, 529 U.S. at 395. These records showed that Williams' parents were imprisoned for child neglect, he was repeatedly and severely beaten by his father, he was placed in an abusive foster home, he was borderline mentally retarded, and he did not advance beyond the sixth grade in school. *Id.* Tharpe's trial counsel did not mistakenly fail to uncover any juvenile or social services records regarding Tharpe's alleged "nightmarish childhood." *Id.* Apparently no such records exist. The only evidence of abuse and privation presented in Tharpe's case were "artfully drafted" affidavits that directly contradict what Tharpe, and every other friend and family member, told trial counsel during their pretrial investigation and contradict much of what these same witnesses said during Tharpe's sentencing hearing.[15] *Waters*, 46 F.3d at 1514. Unlike Williams' counsel, Tharpe's trial counsel performed a reasonable

---

[15] Tharpe has presented no corroborating evidence showing that he was "raised by neglectful and physically abusive parents." (Doc. 62 at 17). He has not introduced documents from DFACS or other social services agencies, school records documenting abuse or suspected abuse, medical records documenting abuse or suspected abuse, or any record showing he reported abuse to any mental health expert.

investigation and strategically decided what mitigation evidence to present based on what they were told at the time.  See *Rhode*, 582 F.3d at 1288 (distinguishing *Williams*); *Chandler v. United States*, 218 F.3d 1305, 1317 n.21 (11th Cir. 2000) (same).

Tharpe cites *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), to support his position that trial counsel unreasonably limited their investigation into his mental health and were, therefore, unable to present evidence of his "significantly subaverage intellectual functioning."  (Doc. 57 at 61).  *Ferrell*, unlike Tharpe, suffered from "obvious mental disabilities," such as "visible facial movements, strange 'affect' or 'demeanor,' obsessive religious beliefs, odd behavior following the crime, and most notably, the seizure he had in front of counsel and the court during the trial."  *Id.* at 1234.  However, Ferrell's trial counsel never questioned family members about his mental health and limited their expert's examination to two questions—whether Ferrell was mentally retarded and whether he suffered from any condition that might have affected his waiver of rights prior to giving his statement to police.  *Id.* at 1227.  Given these facts, the Eleventh Circuit held the state court's conclusion that trial counsel's investigation and presentation of mitigation evidence was not deficient constituted an unreasonable application of *Strickland*.  *Id.* at 1226-27.  Unlike Ferrell, Tharpe suffered from no obvious mental disabilities; reported no head injuries; and his family reported he was a decent student who graduated from high school.  See *Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000) (counsel not required to seek independent evaluation when

defendant does not display strong evidence of mental illness); *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998) (same).  Tharpe was examined by two psychologists and trial counsel in no way restricted Moore's examination.  (Doc. 15-15 at 159).  In light of all of the information they obtained from Storms, Moore, Tharpe, and Tharpe's friends and family, trial counsel did not perform deficiently for failing to further investigate Tharpe's mental health after receiving Moore's report.  Trial "counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'"  *Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009); *Rhode*, 582 F.3d at 1281 (explaining that "even when trial counsel's investigation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, in the circumstances, not to investigate further") (internal citation and quotation marks omitted).  Thus, the state habeas court's decision that trial counsel made a reasonable investigation into Tharpe's mental health and made a reasonable strategic decision not to present mental health evidence did not involve an unreasonable application of *Strickland*.

Tharpe cites *Sears v. Upton*, 130 S. Ct. 3259 (2010) and *Porter v. McColllum*, 558 U.S. 30 (2009), for the proposition that "a mitigation theory chosen without an in-depth inquiry into [the defendant's] background seriously undermine[s] the validity of [the

defendant's] sentence, even though counsel did present some mitigation evidence."[16]

(Doc. 57 at 54).  Both of these cases are distinguishable for several reasons.  First, unlike

in Tharpe's case, the state court's decision in Sears was not subject to the deferential

review required by AEDPA because it was before the Supreme Court on direct appeal

from state collateral review.  *Sears*, 130 S. Ct. at 3261 n.1.  Also, the state habeas court

found that counsel's investigation into mitigation evidence was deficient because he

spent only a "day or less, talking to witnesses selected by [Sears'] mother."  *Id.* at 3264.

That was not the case here.  As already explained, trial counsel spoke with Tharpe, his

friends, and his family on several occasions; they reviewed Storms' psychological

evaluation; and had Tharpe evaluated by Moore.  Finally, the state court in *Sears*

expressly refused to conduct the *Strickland* prejudice analysis because trial counsel had

presented some evidence during sentencing.  *Id.*  The Supreme Court found this

constituted an unreasonable application of *Strickland* and held that "in all

circumstances" the prejudice inquiry involves considering "'the totality of the available

mitigation evidence—both that adduced at trial, and the evidence adduced in the

---

[16] Tharpe also cites *Sears* for the proposition that some adverse facts, such as Tharpe's alcohol and drug abuse, can be considered mitigating when considered along with his mental health problems.  There may be situations in which alcohol and drug abuse may be mitigating. However, the Eleventh Circuit has repeatedly explained that "alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing." *Tompkins v. Moore*, 193 F.3d 1327, 1338 (11th Cir. 1999).  The state habeas court found that trial counsel made a reasonable strategic decision not to present evidence of alcohol or drug abuse. This decision did not involve an unreasonable application of *Strickland*, nor was it based on any unreasonable factual findings.

habeas proceedings—and reweig[hing] it against the evidence in aggravation.'"  *Id.* at

3266-67 (quoting *Porter*, 558 U.S. at 41).  The state habeas court in Tharpe's case did not

find a lack of prejudice simply because trial counsel presented some mitigation

evidence.  Instead, it considered the mitigation evidence presented both at trial and

during the habeas proceedings and reweighed it against the evidence in aggravation

before deciding that there was no reasonable probability that the additional testimony

would have changed the outcome of Tharpe's sentence.  (Doc. 19-10 at 13-14, 37-40).

This is the appropriate *Strickland* prejudice analysis.

The investigation conducted in *Porter* was far more limited than that undertaken

in this case.  Porter's trial "counsel did not even take the first step of interviewing

witnesses or requesting records."  *Porter*, 558 U.S. at 39.   In fact, he had only one

meeting with Porter prior to the trial.  *Id.*  Porter's trial counsel also ignored avenues for

investigation contained in his court-ordered competency evaluation, including his few

years in school, his military service and wounds sustained in combat, and his "father's

'over-disciplin[e].'"  *Id.* at 40.  As explained previously, Tharpe's trial counsel did not

ignore any such red flags.

Tharpe, citing *Fleming v. Zant*, 259 Ga. 687, 386 S.E.2d 339 (1989) and *Lawhorn v.

Allen*, 519 F.3d 1272 (11th Cir. 2008),[17] alleges that trial counsel's decision to forego a

---

[17] In *Fleming*, the Georgia Supreme Court held that under the Georgia Constitution, it constitutes cruel and unusual punishment to execute a defendant who is mentally retarded.  *Fleming*, 259

mental retardation or a mental deficiency defense was based on their ignorance of the applicable law regarding mental retardation[18] and their ignorance that mental impairments short of mental retardation could be considered mitigating.  The record shows that trial counsel's decision to forego a mental retardation defense was based on their own observations of Tharpe and, more importantly, on the reports from two mental health experts that expressly showed Tharpe was not mentally retarded.  (Doc. 15-17 at 18-29).  Moreover, the record shows that trial counsel was aware that impairments short of mental retardation could be mitigating.  Newberry explained that he debated whether they should use Tharpe's diagnosis of low intelligence as part of their strategy, but decided against it because he believed it would not go over well with the jury.  (Doc. 15-13 at 129).

Tharpe claims that the state habeas court unreasonably failed to recognize that his claim of trial counsel's ineffectiveness was not based solely upon their failure to make a case that Tharpe was mentally retarded.  (Doc. 57 at 90-91).  According to him, the state habeas court did not realize he also alleged that information regarding his

Ga. at 690, 386 S.E.2d at 342.  In *Lawhorn*, the Eleventh Circuit held that a decision made not upon a thorough investigation of the law, but upon a misunderstanding of a clear rule of procedure, constitutes deficient performance.  *Lawhorn*, 519 F.3d at 1295-96.  There was no clear rule of procedure about which Tharpe's trial counsel was unaware.

[18] To support this contention Tharpe cites Newberry's testimony during the 1998 state habeas evidentiary hearing.  Newberry stated that he was "not sure" of Georgia's definition of mental retardation and would "[v]aguely … say sixties and down"; he could not recall exactly how a diagnosis of mental retardation would have impacted a case tried in 1991; and he did not recall whether there was a statutory prohibition against executing a mentally retarded person in 1991.  (Doc. 15-15 at 85).

limited intelligence was mitigating, even if a case for mental retardation could not be made.  (Doc. 57 at 91).  The state habeas court's opinion shows that it considered trial counsel's failure to present evidence of Tharpe's limited intelligence.  (Doc. 19-10 at 65-66).  It found their decision reasonable and found that Tharpe was not prejudiced.  (Doc. 19-10 at 65-68).

In conclusion, "*Strickland* requires that counsel either make a reasonable investigation of the law and facts relevant to a case or make a reasonable decision not to carry out a particular investigation."  *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 787 (11th Cir. 2003).  Based on the information obtained from all sources, trial counsel made a reasonable decision not to pursue further leads and to stick with their mitigation strategy.  The state habeas court's decision finding such was not contrary to, or involve an unreasonable application of, *Strickland*, nor was it based on any unreasonable determinations of facts.  The same is true of the state habeas court's determination that Tharpe was not prejudiced by trial counsel's investigation and presentation of mitigation evidence.[19]

---

[19] Tharpe claims "rather than considering 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas hearing," the state habeas court simply dismissed all evidence that contradicted the mitigation presentation at trial, contrary to clearly established federal law."  (Doc. 57 at 96).  Not so.  The state habeas court considered the affidavits submitted by Tharpe in support of his claim that trial counsel were ineffective in their presentation of mitigating life history evidence and considered the mental health evidence.  (Doc. 19-10 at 39).  Respondent explains that "[u]ltimately the habeas court's determination reveals that the court found that the testimony of the witnesses at trial was more

**B. The state habeas court's rejection of Tharpe's mental retardation claim**

Tharpe claims that the evidence overwhelming demonstrates that he suffers from

mental retardation and, thus, is exempt from execution.  He argues that the state habeas

court's finding to the contrary was based on unreasonable factual determinations and

involved an unreasonable application of *Atkins v. Virginia*, 536 U.S. 304 (2002).[20]

In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the

execution of the mentally retarded.  *Id.* at 321.  The Court recognized that "[t]o the

extent there is serious disagreement about the execution of mentally retarded offenders,

it is in determining which offenders are in fact retarded."  *Id.* at 317.  "Atkins expressly

left it to the states to develop the procedural and substantive guides for determining

who is mentally retarded."  *Hill*, 662 F.3d at 1338 (citing *Bobby v. Bies*, 129 S. Ct. 2145,

2150 (2009)).

The definition of "mental retardation" in Georgia

is consistent with that supplied by the American Psychiatric Association's
Diagnostic and Statistical Manual of Mental Disorders (Third Edition
1980) (hereinafter DSM III).  The essential features of mental retardation

---

reliable and credible than the contradictory evidence they later submitted in their habeas
affidavits." (Doc. 58 at 54).  Such credibility determinations are findings of fact presumed to be
correct unless rebutted by clear and convincing evidence.  *Bottoson v. Moore*, 234 F.3d 526, 534
(11th Cir. 2000).  Tharpe has presented no such evidence.

[20] Tharpe also alleged that trial counsel were ineffective for not investigating and presenting
evidence of mental retardation.  The state habeas court found that Tharpe failed to prove the
requisite prejudice prong under *Strickland* as he did not prove that he was mentally retarded
and, therefore, trial counsel were not ineffective.  (Doc. 19-10 at 69, 98).

are (i) significantly subaverage general intellectual functioning, (ii)
resulting in or associated with impairments in adaptive behavior, and (iii)
manifestation of this impairment during the developmental period.
O.C.G.A. § 17-7-131(a)(3).

"Significantly subaverage intellectual functioning" is generally defined as
an IQ of 70 or below.  DSM III, supra at 36.  However, an IQ test score of
70 or below is not conclusive.  At best, an IQ score is only accurate within
a range of several points, and for a variety of reasons, a particular score
may be less accurate.  Moreover, persons "with IQs somewhat lower than
70" are not diagnosed as being mentally retarded if there "are no
significant deficits or impairment in adaptive functioning."  DSM III,
supra at 37.

*Striping v. State*, 661 Ga. 1, 4, 401 S.E.2d 500, 504 (1991).

It is important to keep in mind that Georgia requires a criminal defendant to prove

beyond a reasonable doubt that he is mentally retarded.  O.C.G.A. §17-7-131(c)(3).

The state habeas court reasonably found that prior to trial Tharpe was examined

by Storms and Moore and they both, at that time, reported he was not mentally

retarded.  (Doc. 19-10 at 71).  Storms found that "intellectual testing reveal[ed] that Mr.

Tharpe is of average intelligence.  He exhibited no signs of mental retardation and his

IQ score on the Ravens Progressive Matrices is 87, which places him in the average

range of intelligence."  (Doc. 15-17 at 19).  Moore found that Tharpe's "functional

intelligence … falls in the borderline range but … should not be considered as mentally

retarded."  (Doc. 15-17 at 27).

During discovery for his state habeas proceedings, Tharpe was evaluated by three additional mental health professionals:  Medical psychologist Dr. Marc L. Zimmerman and neuropsychologist Dr. Barry Crown, Tharpe's experts; and clinical psychologist and lawyer Dr. Glen N. King, Respondent's expert.

Regarding the first prong of Georgia's statutory definition of mental retardation, "significantly subaverage intellectual functioning," the state habeas court found:

> Petitioner's expert, Dr. Zimmerman, administered several psychological tests to determine Petitioner's IQ.  The results of the WAIS-III administered by Dr. Zimmerman in 1998, yielded a full scale IQ score below 70.  Respondent's mental health expert, Dr. King also administered the WAIS-III, although a number of years later, which resulted in a full scale IQ score below 70.
>
> There is little dispute among the numerous mental health professionals who have evaluated Petitioner over the years that Petitioner has low intelligence, with scores falling anywhere from average, to borderline, to subaverage intelligence.  However, as held by the Georgia Supreme Court, persons "with IQs somewhat lower than 70" are not diagnosed as being mentally retarded if there are no significant deficits or impairment in adaptive functioning."  This Court finds that it cannot make a determination of mental retardation solely on Petitioner's IQ score, thus this Court looked to Petitioner to determine whether the other two prerequisite[s] for a diagnosis of mental retardation, which if he does not prove exist beyond a reasonable doubt, his claim fails.

(Doc. 19-10 at 71-72) (citations omitted).

Tharpe argues that the state habeas court unreasonably characterized Mr. Tharpe's scores on IQ tests as ranging from "average" to "below average."  (Doc. 57 at

110).  The record shows Tharpe had test scores ranging from 87 on the Raven's

Progressive Matrices, which indicated Tharpe was in the average range of intelligence,

to 66 on the WAIS—III, which indicated he was in the below average range.  (Docs. 15-

17 at 19; 17-1 at 58-59).  Thus, the state habeas court's finding was reasonable.

Tharpe argues that "[a]ny suggestion by the state habeas court that Mr. Tharpe's

IQ scores may not meet the diagnostic criteria for mental retardation is an unreasonable

fact finding."  (Doc. 57 at 107).  The state habeas court did not make such a suggestion.

It found that "there was little dispute" that Tharpe has low intelligence and it

concluded that "intellectual testing, alone, places Petitioner in the sub-average range of

intellectual functioning as required for a finding of mental retardation."  (Doc. 19-10 at

72, 97).

Tharpe claims the state habeas court determined that he failed, by virtue of not

having been diagnosed as mentally retarded prior to age eighteen, to establish that his

impairment manifested in the developmental period.  (Doc. 57 at 111).  According to

Tharpe, this finding was unreasonable because there is no requirement that the initial

diagnosis of mental retardation be made before age eighteen.  (Doc. 57 at 111).  Giving

the state habeas court's opinion "'the benefit of the doubt,'" as this Court must, it does

not appear the court found it was an actual prerequisite that Tharpe be diagnosed as

mentally retarded during childhood.  *Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315,

1331 (11th Cir. 2013) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).  What the state habeas court actually stated was the absence of any IQ score below 70 prior to age eighteen was "compelling evidence" that Tharpe did not meet the requirement for finding mental retardation.  (Doc. 19-10 at 97).  The Court cannot find this was unreasonable based on the facts or constituted an unreasonable application of *Atkins*.

The real dispute among the experts involved the second prong of the mental retardation analysis.  An individual meets the adaptive functioning component for a mental retardation diagnosis when there are "significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and health, and safety."  (Doc. 17-15 at 25, 35).

Tharpe's expert, Zimmerman, testified that he interviewed Tharpe, reviewed Tharpe's school records, reviewed evaluations from other mental health experts, looked at excerpts from the trial transcript, and reviewed affidavits tendered by Tharpe during state habeas proceedings.[21]   (Doc. 17-1 at 46, 51-52, 86, 108).  Regarding adaptive behavior, Zimmerman found Tharpe had deficits in five of the categories.[22]

---

[21] These affidavits were from Naomi Bates Tharpe (Tharpe's mother), Jo Bess Grenga (a former teacher), Audrey Tharpe Pope (Tharpe's sister), Fannie Bates Green (Tharpe's aunt), Migrisus, Cheryl Mann (Tharpe's cousin), Storms, and Lewis Horne.  (Doc. 17-1 at 86)
[22]. State habeas counsel also tendered an affidavit in which Moore stated that the evidence suggested Tharpe suffers significant deficits in several of the skill areas.  (Doc. 17-9 at 43-44)

First, Zimmerman testified Tharpe's school records and results from academic tests showed substantial deficits in functional academic. (Doc. 17-1 at 65-67, 95). Zimmerman also found Tharpe had deficits in the category of work because Tharpe "had low skill jobs, such as laborer, cutting grass, that sort of thing.  And most of the jobs were of short duration, a few months, three or four months or less." (Doc. 17-1 at 68).  Zimmerman acknowledged that he had spoken with no teachers or employers before reaching his conclusions regarding deficits in functional academics and work. (Doc. 17-1 at 103, 107).  He also admitted that drug and alcohol use can affect someone's performance in school and a work.  (Doc. 17-1 at 102, 108).

Zimmerman stated that Tharpe had adaptive functioning deficits in the area of home living and community resources.  (Doc. 17-1 at 70).  He based this on Migrisus' affidavit in which she explained she was in charge of the finances and that he did "some home care, some picking up or cleaning up, but only upon direction" and he did not help the children with their homework.[23]   (Doc. 17-1 at 71).

Zimmerman also found deficits in self-direction.  (Doc. 17-1 at 72).  He opined that Tharpe could not "ever live independently" and that, if released from prison, he could not manage daily life without support.  (Doc. 17-1 at 70, 74).

---

[23] As explained previously, during the July 30, 2007 evidentiary hearing, Migrisus testified that she never actually said much of what was contained in her affidavit.  (Doc. 17-2 at 3-23).

Zimmerman explained that he spoke with no one in person other than Tharpe to reach his opinions.[24]  (Doc. 17-1 at 85).  Instead, he relied on the affidavits that were prepared by Tharpe to use in his state habeas corpus action.  (Doc. 17-1 at 85).  He acknowledged that some of the affidavits could be biased and admitted that parts of the trial transcript directly contradict the affidavits.  (Doc. 17-1 at 85, 110).  Zimmerman testified that he performed no standardized tests to determine Tharpe's adaptive skill level even though the American Association on Mental Retardation manual entitled Mental Retardation Definition, Classification, and Systems of Support provides that standardized measures should be used to establish significant limitations in adaptive behavior.  (Docs. 17-1 at 91-92; 17-15 at 5).  He explained that standardized tests are not appropriate when a person is incarcerated.  (Doc. 17-1 at 92).  Ultimately Zimmerman determined that Tharpe met the second requirement for a finding of mental retardation.[25]  (Doc. 17-1 at 72).

King, Respondent's expert, evaluated Tharpe in March 2007.  (Doc. 17-2 at 88-90).  Before evaluating Tharpe, King reviewed raw data and a letter from Crown,[26] raw data

---

[24] Zimmerman spoke with several of the affiants years later, a few weeks or months just prior to his testimony at the July 30, 2007 evidentiary hearing.  (Doc. 17-1 at 108, 121).  However, he did not speak with these individuals before reaching his conclusions in 1998.  (Doc. 17-1 at 124)
[25] Zimmerman also found that Tharpe's developmental delays and academic problems started early in his life.  (Doc. 17-1 at 74-75).
[26] Crown had performed a neuropsychological consultation to determine if Tharpe suffers from brain damage.  (Doc. 17-2 at 27-29).  Crown did not independently diagnose Tharpe as mentally retarded because he did not test for IQ or adaptive functioning.  (Doc. 17-2 at 31-32, 64, 77, 83).  Crown found that Tharpe was functioning at an age equivalency of 11 years, 5 months, or

and an affidavit from Moore, raw data and an affidavit from Zimmerman, various court orders, school records, medical records, and affidavits from various individuals. (Doc. 17-2 at 92, 98). King also relied on his own interview, mental status examination, and psychological testing of Tharpe.[27] (Doc 17-2 at 92).

To help measure Tharpe's adaptive functioning, King administered the Adaptive Behavior Assessment System, second edition ("ABAS-II"). (Doc. 17-2 at 93). King testified that "[t]here is a requirement by the American Association for Mental Retardation that you use a standardized device in order to assess adaptive functioning because not doing that means that you're left with just speculation about certain activities, whether they meet the criteria or not." (Doc. 17-2 at 106). King stated that the ABAS-II "manual says that it's appropriate for use in prisons, specifically mentions prisons." (Doc. 17-2 at 108). King explained the test involved a "structured interview" of Tharpe in which he was verbally asked a series of questions to which he responded

---

someone in the sixth grade. (Doc. 17-2 at 35). He testified that Tharpe has a "neuropsychological impairment, … brain damage[], and that [his] brain damage occurred very early in his life." (Doc. 17-2 at 84). Crown explained that the frontal lobe brain damage from which Tharpe suffers causes problems with reasoning, judgment, concentration, attention, self-evaluation, and understanding the long term consequences of behavior. (Doc. 17-2 at 36). Crown acknowledged that not everyone who exhibits these problems is mentally retarded. (Doc. 17-2 at 77).

[27] King, like Zimmerman, also performed psychological tests to determine Tharpe's IQ. (Doc. 17-2 at 93). As stated previously, there was "little dispute" among the experts that Tharpe suffers from low intelligence and King found he had a full scale IQ score of 67. (Docs. 17-2 at 101; 17-3 at 20; 19-10 at 72).

and "rate[ed] himself." (Doc. 17-2 at 107-09). King testified that Tharpe understood and was able to answer each question. (Doc. 17-2 at 114).

Tharpe's general adaptive composite score on the ABAS-II was 79. (Doc. 17-2 at 112). This, according to King, would place Tharpe in the borderline range of ability with regard to adaptive functioning. (Doc. 17-2 at 112). King explained:

> My reading of the requirements [is] that if we're going to look at a numerical score that significant impairment is anything two standard deviations below the mean or below that, in other words, a score of roughly 69 or lower. He does have impairments, there's no question about that, but he functions in the borderline range of ability with regard to his daily living skills. He may not be able to use a checkbook. He can pay some bills and do that on occasion. And he says … in his responses that he never used a checkbook and basically wouldn't know how to do that. He is able to drive around. He may not have a real high level job. I mean, he's impaired relative to the general population, but he's still self-sufficient…. [F]or me, that's the bottom line: he can take care of himself, he can get a job, he can get his own place to live, he can feed himself, he can clothe himself, he can maneuver around the system and take, basically, take care of himself.
>
> …
>
> I think we all agree that Mr. Tharpe has some deficits in his cognitive functioning, his adaptive functioning. It is one of degree. I don't think that Mr. Tharpe's deficits reach the threshold that indicate mental retardation because in my opinion, based on everything I've seen, he's able to take care of himself and function independently, and has done that on numerous occasions.

(Doc. 17-2 at 113, 121).

King testified that in his overall evaluation he did not rely solely on the results of the ABAS-II.  (Doc. 17-2 at 115).  He also took into consideration the results from various intelligence tests; the results from the achievement battery test; Tharpe's clinical history; medical records, school records, police records, and various affidavits.  (Doc. 17-2 at 116, 126-27).  King explained that he could not rely solely on the affidavits to determine adaptive functioning because "various individuals can be quiet biased in terms of what they know the affidavit is going to be used for."  (Doc. 17-2 at 122-23).  When possible, King would corroborate any information Tharpe gave him with past records or affidavits.  (Doc. 17-2 at 110).

The state habeas court found that Tharpe had not proven beyond a reasonable doubt that, before the age of eighteen, he had significant limitations in two of the adaptive functioning categories.  Thus, he had failed to support his claim of mental retardation and the court denied the claim.  (Doc. 19-10 at 70, 73-97)

Tharpe claims that the state habeas court's decision was based on unreasonable factual findings and involved an unreasonable application of *Atkins*.  He complains that the state habeas court overlooked or ignored evidence that conclusively demonstrated King's ABAS-II testing was invalid.  In an affidavit tendered to the state habeas court, Dr. Thomas Oakland, co-author of the ABAS-II, testified regarding "the use of the ABAS-II with persons who are incarcerated and display diminished mental ability."

(Doc. 17-4 at 54).  He stated that "professionals should not form judgments of the adaptive behavior based principally on data from (1) someone confined to a prison and/or (2) someone who displays evidence of mental retardation or significantly diminished intelligence."  (Doc. 17-4 at 57).  While the state habeas court did not mention Oakland by name, it did consider whether the test results were valid for an incarcerated person.  Relying on King's testimony, it found that the ABAS-II specifically mentions that is appropriate for use in prisons.  (Doc. 19-10 at 76).  The state habeas court also relied on King's testimony regarding Tharpe's ability to answer the questions and determined that Tharpe was able to understand and respond to the questions. (Doc. 19-10 at 75-77).

   The state habeas court also found that King did not rely solely on the results from the ABAS-II to reach his determination that Tharpe did not have significant impairments in adaptive functioning.  (Doc. 19-10 at 77).  Although Tharpe maintains this was an unreasonable finding of fact, it was supported by the record.  (Doc. 17-2 at 115-20).  Citing King's Psychological Evaluation, Tharpe alleges that the state habeas court's determination that King relied on a wider array of sources than Zimmerman was an unreasonable finding of fact.  While King's report listed ten data sources, he testified that he reviewed additional sources such as school records, medical records, as well as affidavits from various individuals, which were apparently attached to his copy of Moore's raw data or affidavit.  (Doc. 17-2 at 92, 98).

The state habeas court "questioned the reliability of" affidavits from family members and friends submitted to the state habeas court.  (Doc. 19-10 at 78).  Tharpe seems to allege that this was unreasonable because the affidavits are consistent with other documentary evidence.  (Doc. 57 at 126).  The affidavits are inconsistent with the pretrial information given to trial counsel and directly at odds with much of the testimony presented during Tharpe's trial.  Also, Migrisus' affidavit had many statements about Tharpes' various inabilities.  (Doc. 17-4-39-42).  When Migrisus testified in person, she flatly denied or disputed many of these statements.  Given this, the Court cannot find unreasonable the state habeas court's characterization of the affidavits as biased.

Tharpe contends that the "state habeas court's determination that Mr. Tharpe could not be mentally ill because he was able to work low skill jobs" involved an unreasonable application of *Atkins*.  (Doc. 57 at 140-41).  The state habeas court did not make such a finding.  Holding only menial jobs is certainly consistent with mild mental retardation.  *Thomas v. Allen*, 607 F.3d 749, 759 (11th Cir. 2010).  Citing Zimmerman's testimony, the state habeas court acknowledged as much.  (Doc. 19-10 at 93).  What the state habeas court found was that holding only menial jobs does not conclusively establish that a person is mentally retarded.  (Doc. 19-10 at 93).  This was not an unreasonable finding.

To prove deficits in the area of work, Zimmerman pointed to two factors: Tharpe's "low skilled jobs" and the fact that the jobs lasted only for a "short duration, three or four months or less." (Doc. 17-1 at 68). Finding that Tharpe had not proven deficits in the area of work, the state habeas court found there was no evidence that Tharpe lost any of these jobs due to his inability to perform required tasks;[28] he was most recently employed with a construction union where the duration of any particular job was necessarily short; other factors, such as substance abuse, may explain his work history; he worked at a local mill for approximately two years; and he had been consistently employed prior to his incarceration. (Doc. 19-10 at 93-96). These were not unreasonable determinations of fact and the state habeas court's determination did not constitute an unreasonable application of *Atkins*.

Tharpe alleges that the state habeas court found that activities such as writing letters to pen pals, reading time on a clock, giving the correct amount of money when making purchases, keeping accurate scores in a game, and making phone calls are incompatible with mental retardation or represent a high degree of adaptive functioning. (Doc. 57 at 136). This, according to Tharpe, was an unreasonable finding of fact and involved an unreasonable application of *Atkins*. What the state habeas court actually found was that such evidence, along with other factors, corroborated King's

---

[28] Migrisus' affidavit showed that Tharpe "sometimes would quit because other workers would crack jokes about him when he couldn't keep up the pace on the job." (Doc. 17-4 at 41). She testified, "I never said that" because she had never heard that before. (Doc. 17-2 at 12).

determination that Tharpe does not suffer substantial deficits in the area functional

academics.  (Doc. 19-10 at 88).  The state habeas court found that grades alone do not

determine someone's **functional** academic abilities.[29]  This was a reasonable finding.  It

found the following factors, along with those mentioned above, support the finding that

Tharpe has adequate adaptive functioning in the area of functional academics:  Tharpe

was not socially promoted during this high school years; he "stuck with the school

system" until he graduated from high school; he followed through on what was

necessary to pass a course, such as attending summer school; and he participated in

organized sports, in which he had to interact with other students and faculty.  (Doc. 19-

10 at 85-88).  These findings were reasonable and did not involve an unreasonable

application of *Atkins.*

     This Court must keep in mind that "[a] state court's application of clearly

established federal law or its determination of the facts is unreasonable only if no

'fairminded jurist' could agree with the state courts' determination or conclusions."

*Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting

*Harrington*, 131 S. Ct. at 786)).  The Court also has to keep in mind the "beyond a

reasonable doubt" burden of proof that applies to claims of mental retardation in

---

[29] Functional academics is defined as:  "cognitive abilities and skills related to learning at school that also have direct application in one's life (e.g., writing; reading; using basic practical math concepts...).  **It is important to note that the focus of this skill area is not on grade-level academic achievement, but, rather, on the acquisition of academic skills that are functional in terms of independent living.**"  (Doc. 17-15 at 21) (emphasis added).

Georgia.  Utilizing AEDPA deference, the Court finds that the state habeas court's decision that Tharpe failed to prove beyond a reasonable doubt that he is mentally retarded was not based on an unreasonable determination of the facts.  Nor did that decision involve an unreasonable application of *Atkins*.  Therefore, the Court must deny relief on this claim.

### C.  The beyond a reasonable doubt standard for proving mental retardation

O.C.G.A. § 17-7-131(c)(3) provides that a criminal defendant must prove beyond a reasonable doubt that he is mentally retarded.  This was the standard applied by the state habeas court.  Tharpe contends this standard violates the Eighth and Fourteenth Amendments under *Atkins*.  The Georgia Supreme Court has repeatedly found the reasonable doubt standard for proving mental retardation is constitutional.  *Stripling v. State*, 289 Ga. 370, 711 S.E.2d 665 (2011); *Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613 (2003).  In the *en banc* opinion *Hill v. Humphrey*, 662 F.3d 1335 (11th Cir. 2011), the Eleventh Circuit found that Georgia's burden of proof for mental retardation claims was not contrary to, or involve an unreasonable application of, any established United States Supreme Court precedent.  This Court is bound by *Hill*.  The Court denies relief on this claim.

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Tharpe's Petition for Writ of Habeas Corpus by a Person in State Custody.

## V. CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a Certificate of Appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

The Court can issue a COA only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To merit a COA, the Court must determine "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations omitted).  If a procedural ruling is involved, the petitioner must show that "jurists of reason would find it debatable

- 56 -

whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court issues a COA on the following issue:

Whether the state habeas court's determination that Tharpe's trial counsel was not ineffective in the investigation and presentation of mitigation evidence was based on an unreasonable determination of the facts, or was contrary to, or involved an unreasonable application of, clearly established federal law.

In relation to all other claims, grounds, and issues raised in Tharpe's original and amended habeas petitions, the Court finds that the standard shown above for the grant of a COA has not been met.

**SO ORDERED**, this 6th day of March, 2014.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

lnb